Good morning, your honors. May it please the court. Krista Hart on behalf of John Burns. The main issue in this case is the insufficiency of the evidence. And the main factor within that issue is that there was no establishment of what generally accepted accounting practices were in this industry. A number of the government's own witnesses testified that the accounting And so the fact that the government's other witness, Ms. Happel, from the prior banking relationship and the prior bank, that she disagreed with it, was really not relevant and didn't overcome the burden of having to prove that this was not the accurate and the correct way to book the accounts receivable. Your client's arrangement, contractual arrangement, with North Rim, is that the bank we're concerned with now? Yes. And that required him to accurately report to the bank the nature of his accounts receivable, correct? Well, it actually doesn't define what an accounts receivable is. So while it says You were loaning him money, advancing him money on a line of credit, correct? Correct. On receivables that were or would be due to him, is that correct? Correct. And my understanding is he had no records? My understanding from what was said on the record in this case was that the records were eventually lost. So But what the government offered were the bank's records of what Mr. Burns reported to them. Yes. And compared to the records of the entities that he was dealing with on this particular project or these particular projects. And the problem with that What's wrong with that comparison? The problem with that comparison is that accounts receivable are different than what the pay estimates are, which are what the entities that were the generals, so to speak, of the construction project. Pay estimates are accounts payable. You pay accounts receivable with accounts payable when they're converted into cash. Well, so you have the general contractor. That's the one who is overseeing the entire project. On the books of the general contractor, he has a account payable to your client. It should balance with the account receivable of your client. It didn't. Or even within some range, given the lapse of time for reporting and deposit and clearing. It should reconcile over time. It could be up to 90 days. It should reconcile somewhat. Over projects. Correct. I mean, for instance, there was evidence that your client was claiming as an account receivable an account which had been paid. When an account is paid, you, as I remember it, you debit account receivable and credit cash. And that's where the timing comes into play here, Your Honor. And I highlighted that in my reply brief in a brief timeline, which is and explains how that occurs. And while it seems incorrect on its face, it's not. Well, see, that's the difficulty of the standard we're using now on review on sufficiency of the evidence. So probably we're talking about count 26, where he says, I have an account receivable of over $400,000. And an employee testifies, no, actually we didn't owe him anything at that time. So it isn't even like some of these other counts where there's small shortfalls. It's huge. So that's the evidence in front of the jury. I put $480,000 on my accounts receivable. Employee comes in and says, no, we didn't owe the guy anything at that point. So tell me under the sufficiency of the evidence standard, why that doesn't work. Because simply saying, simply having a clerk from the general construction company saying we didn't owe him anything at that time isn't sufficient. And I highlighted Why? I mean, you could argue to the jury, look, this person didn't explain the timing, this person didn't do this. That's argument to the jury. But the question is, could the jury make a determination based on that? And it seems to me that's a different question. You're kind of re-arguing the case as opposed to the sufficiency of the evidence. Well, what I'm arguing here is, it's on page five of my reply brief, which demonstrates how even though the general has cut the check to Mr. Burns, there's a time lapse there. He hasn't received the check. It hasn't been deposited. It hasn't been booked into his accounting procedure. So while the general might say, at that point, we didn't owe him any money. However, Mr. Burns has not yet received the money. That's fertile ground for cross-examination. Is that how the clerk was cross-examined? To a small extent. Small extent, right. So then the jury's left with a clerk or an employee who's not particularly impeached that makes a statement. It's left to benchmark that. I mean, it have sufficient for the sentence of 36 months, and you wouldn't even need to know the answer to all these others, right? No, I would disagree with that. Because actually, it's my belief that counts 25 and 26. He did not borrow any money against those statements that were made. The bank did not act on those statements. So they're missing an element of the charge on those two counts, 25 and 26. So I'm not convinced that the government did prove that. That they did prove all of the elements. Because there was no purpose to influence the bank at that point. Because he wasn't getting any funds. So I do believe that there was insufficient evidence as to all counts in this field as the subcontractor. They're not going back to their office every day and creating an itemized, detailed invoice. And the jury got to hear the gist of this, correct? Yes. Through cross-examination. Yes. And then it made its decision. So under the Jackson v. Virginia standard, could no rational juror come to this conclusion? I would say that no rational... And I believe that, yes, that no rational juror could come to this conclusion because we don't have any evidence of how it should have been done. Like what was the correct way to do it? There was no witness that testified to what was accepted procedure. And so, well, Ms. Happel from the prior bank and the prior relationship, which in my opinion should have been excluded under 404B, that evidence came in. Was that objected to? It was objected to. It was a brief exchange prior to the second trial where defense counsel brought it up, indicated that... I don't believe he used the word I object, but he indicated that he was troubled with the admission of it. And there was never a real resolution as to that issue. I'm trying to remember my days in trial practice and defending people and wondering what a U.S. district judge would have done if I stood up and said, Your Honor, I'm troubled with that evidence. I'm not sure that I don't recall if that's the exact word that he used, but he did not use the word I object, as I recall. Did the arrangement Burns had with North Rim Bank require him to report to them accurately cost already incurred and work already completed? Yes, that is the... That's the standard definition of an account receivable. Correct. And was there evidence from which a rational jury could have determined that the information he provided the bank was not correct, was false? It has to be false and it has to be made with the intent. It has to be knowingly false. And I think that's the problem, is it's not knowingly false. Because Mr. Burns used accounting practices that were a little bit different than what Ms. Happel used, maybe more than a little different. Well, and Ms. Happel was not even part of this... Right. Ms. Hart, let me ask you a question. Is it your position that absent expert testimony as to what the gap standards were, here, similar to let's call it malpractice, medical malpractice case, where there's no evidence of the standard of the community, there is a means that we have to reverse? In this factual situation, I would say yes. Do you have a case that says that in a criminal case for false statements, an essential element of the prosecution's case is expert testimony by an accountant as to what the gap procedures are? No, but that's because in this case there were numerous of the government's own witnesses who testified to varying different procedures. So if all of the government's own witnesses had said, it's very clear in this industry, these are the procedures, we follow A, B, and C, and this is the way it is, and then if Mr. Burns was different, then I would submit that, what you're saying. However, in this case, the government's own witnesses said no, what Mr. Burns did is acceptable. Whether it's the two-party check, the vendor check, rebooking accounts receivables, et cetera, they all said this is acceptable. Do any of the government witnesses say it's acceptable for a borrower or the bank to claim an account receivable when he's been paid? I don't think anyone would say that, but the evidence doesn't support that that's exactly what happened. But that's what was argued. That's the only evidence in front of a jury, and they can draw an inference against the backdrop. He has the terms and conditions with the bank. Here's what you're supposed to report. So there's no ambiguity about that. And if he does this time and again and again and again and again, I think the difficulty, and you have a hard case, I think, because you have to argue uphill against the evidence, and obviously he wasn't required to testify. He wasn't required to put in any supporting documentation. That's not his obligation. It's the government's obligation. But in effect you're saying backhandedly to Judge Bea's question that the government needed to have a witness that squared everything up. I think that's your bottom line, right? Essentially, yes. And I say I have three minutes left, so I'd like to reserve that for rebuttal. Good morning, Your Honor. This is Thomas C. Bradley on behalf of the United States. I think the best way to look at the sufficiency of the evidence argument is to do what I asked the jury to do in this case, which is start at the end and work your way back, as you discussed with counsel for the defendant. In the supplemental excerpt of record, the government's exhibit was 6-1, which appears at page 1,052 of the SER. Starting at the bottom of that, in April of 2007, Mr. Burns told North Rim Bank, I have $1,021,750 in accounts receivable. The evidence provided by the general contractor's representatives who testified at the trial all testified. We owed him nothing at that point. And that makes sense, doing construction work in Alaska, because we're not doing construction work in Alaska outside in the wintertime. And essentially, Mr. Burns had not been working, had not been earning any money. He could borrow money on 60 and then up to 90-day aging accounts receivable that were owed to him by the general contractors. The reason that this was a good deal for the bank was because the general contractors in almost all of these cases are paid by the state of Alaska. In the state of Alaska, their checks are good. So it's a revolving line of credit that permits Mr. Burns to operate his business. It's standard in the construction business. And it's a good bet for the bank, because they know that the state of Alaska is going to pay those bills. And the testimony at trial was that Mr. Burns was almost always paid within 8 or 10 days of the claims that were made to be paid. There were some delays, but in most cases he was paid very properly. Is there a stop-notice procedure in Alaska where a subcontractor can give notice to the payor that he is working on a job and therefore the payor has to acquit that debt before the debt is released? I don't know about that. I know that the issue that came up in this case was with stockpile and there was a problem with paying suppliers, and that's why the two-party checks came out. There were some two-party checks. At some point, the contract required the subcontractor to pay up front for the stockpile, to pay the suppliers. When it became clear from the suppliers who had contacted the general contractors, primarily Wilder and QAP, and told them, hey, John Burns isn't paying us, Central Construction isn't paying us, that's when the contractors started issuing the two-party checks. Did the contractors put them in his pocket, or was he forging the signature? No, he had to negotiate those through the second party, and that money went on almost every instance to the supplier because the supplier was owed that money. As we work back through, again, Exhibit 6-1 at page 1052, it's pretty clear going back that all of the claims that he makes on there are just over a million dollars, $1,015,000, $1,040,000, $1,066,000. I think that's evidence that the jury could have considered in determining he knew how much he had to have. He had to have a million in accounts receivable in order to justify the full line of credit, the $750,000. And even though he paid that down at one point and had it paid down to zero back at the end of the summer of the previous year, in the summer of 2006 when he had been getting paid all summer for the work he had been doing, he continued to make those false statements because he knew that he needed to maintain that line of credit. Once you start telling a lie, and that was our argument, that if you start at the end, see that the cupboard was bare, that there was nothing coming in, and then tracing back to the beginning, he was clearly, I think the jury could determine, that he was lying at that time. They did acquit on a couple of the accounts that occurred during the time when he had paid the loan down. Our argument was that those were still false statements, but as you can see from the record, it was pretty close. It was within $100,000 in August of 2006, and that's probably in the area where a jury could give the reasonable doubt to a businessman who is not an accountant that his statements were not intentionally false to the bank. And I think that explains the acquittals on the two accounts as best we can. But I think the evidence in this case was sufficient to establish, particularly tracing from the end when there was nothing there and going back. And again, I don't believe the defense argument holds water that those were not statements that were meant to influence the bank. This is a charge under section 1014, not under section 1344, the bank fraud statute, which does require an intent to defraud the bank when the statement is made. This was simply a false statement to keep the bank at bay so that they did not eventually come in and call the loan, which they eventually did when they didn't hear from him. So to Ms. Hart's assertion that on accounts 25 and 26 the bank did not lend on the receivable information, how do you meet that? They did not lend him additional money. They did maintain the line of credit open. He had, at that point, I believe it was maxed out at $750,000. He did not borrow any more money because he was not working at that time. He was not doing any contractual work in February or April of 2007 because it was wintertime. He essentially had either not completed the jobs or the general contractor's testimony was that they had gone and found other people to complete the work because the work had simply not been done. It was pretty clear from the evidence. So your position is that the statements still influenced the bank in maintaining the line of credit open even though the sums were not advanced at that time? They did, and I believe the evidence was it didn't come in at trial. It was discussed in the pretrial and excluded that when the bank did go out and knock on the door, when North Rim representatives went out and knocked on the door, they found his premises abandoned, and he simply shrugged his shoulders and said, I'm out of business. So that was a number of months later, I think, in the following winter when they finally went and called the loan. How do you meet the objection to the evidence under 404B? Well, the evidence was provided in a notice. It does appear, it's not in the supplemental excerpt, but it does appear in the court's docket at docket 66. And the 404B notice, which there's never any question that notice was provided, simply says that Ms. Happel is going to talk about the fraudulent, misleading job current, aging reports submitted to FNBA, which is the prior bank. No discussion of the items that he objected to. Prior to her testimony, that was provided in June, as will be reflected in the docket on June 26th of 2009 at docket 66. Along with that was provided an FBI 302, which is a summary of the interview with Ms. Happel, whom we identified after the first trial and spoke with. And she had also mentioned in one paragraph that she had reviewed his personal accounts and saw some things that were suspicious there. Pardon me, but I suppose I didn't phrase my question correctly. As to what permissible ground in the 404B was the evidence admissible? It was admissible under all four of the prongs. It was material. The testimony that came in was about submitting job current aging reports and what Mr. Burns knew were considered by the bank to be proper accounts receivable. It was proximate. We were talking about what had happened in early 2006, in the winter of 2006, prior to April of 2006 when he ended his banking relationship with FNBA and went to North Rim. The evidence was sufficiently supported through extensive records, documents that Ms. Happel testified about, and certainly to show intent, which was what it was offered to show, it was very similar to what had happened. He was in the same business, he was doing the same contracts, and he was under a 75% agreement. The only difference was that the FNBA loan was for up to $500,000 line of credit. The initial line at North Rim was for $750,000, for $500,000. What intent did it show? It showed that he knew what a good accounts receivable was. The court is correct in pointing out, and defense is correct in pointing out, that there was no specific paragraph in the loan agreement. I looked a lot, I wish it had been in there, that said this is what an account receivable is. So we simply had to go back and say, what's the general understanding for someone who's been in the business for 30 years? Mr. Burns was told by Ms. Happel that the claims that he was making, he was rebilling accounts receivable, that she was alarmed by the things he was doing. She asked him about a missing $330,000, which he said he did not know about. She told him he had insufficient collateral, and that he was borrowing on the same accounts receivable twice. And then she told him in April he needed to move his banking relationship somewhere else. The fact that she told him, you're basically being fired as a client, and then he went to another bank, and our position was he had lied to North Rim Bank from the get-go, saying, I just don't, I didn't like it over at FNPA. He didn't come and tell the bankers at North Rim, I'm, they're not happy with the way I look at my accounts receivable. Was he charged with any kind of initial misrepresentation in connection with his dealings with North Rim? It was charged in the initial documents he filed with them. Was he charged with lying to North Rim about his reasons for leaving the other bank? No, sir. And I could understand this evidence if the sole purpose it was offered for was to show that Mr. Burns had been explained what an account receivable was and what he was to report. That they terminated the relationship with him or thought he was lying is, folds over into the business of, well, if he did it once, he'll do it again. And that's exactly what 404B is designed to prevent, isn't it? It is. It's not allowed to, you're not allowed to show propensity evidence. Why didn't you confine the evidence to showing that he had been explained by another banking officer what account receivable financing was all about? That was the purpose of the testimony, that she told him. Yeah, but you also offered the fact that they terminated the relationship with him. They did. And that he probably told a fib or a white lie or whatever when he moved over to the other bank about why he left the first bank. He did not mention. He left that part out. There was no affirmative lie. He left that part out. He said, I was looking for a different banking relationship. I didn't like customer service over there. He did not share the fact that they had fired him. What is the relevance of that information to this charge? Because he knew what a good account receivable was. He had been told by his prior banker, you can't book this. But the fact that he told Northrim that I left the other bank because I just wanted to make a change, which apparently is not true, what does that have to do with having a proper account receivable explained to him? I think it would go to his knowledge and his belief. If he believed that what he was telling FNBA was a good account receivable was in fact correct, he would have wanted to clarify that with his new bank and say, look, I'm booking these twice or I'm going to book accounts receivable that might have chargebacks on them or that might have withholding or that might be second-party checks, two-party checks. Is that okay with you? It's okay if I'm a thief and an embezzler. Is that what you're saying? No, I think if he was unsure of what an account receivable was and if he had been told by his prior bank, this is not an account receivable, you can't continue banking with us if you're going to call this an account receivable. That sounds like a good argument, closing to the jury, but I still don't understand why the government felt it necessary to point out that he had not told the truth or was inaccurate in his representations for having left the other bank. It just doesn't connect. Can you help me there? I think it did connect in the fact that he simply was being dishonest with the bank. He was willing to lie to the bank. He's not charged with that. No, he's not, but I think it's helpful for the jury to understand, is this someone who is… Well, I'm sure the prosecution thought it was quite helpful, but that's the problem with 404B type evidence. Is it getting into the area of propensity? Let me ask you a different question about… Yes, ma'am. I'm looking at the indictment. Okay. So, between… On count 10, they say there's a job current aging report, and then there's another job current aging report, count 16, September 12th. But if you took the amount he reported as accounts receivable, which was just over a million dollars in August, and it turned out he got just over a million dollars between August and the next, I guess what you call the job current aging report, why would it be a false statement to say that those were your accounts receivables when, in fact, reality confirmed receipt? That was the defense argument during the trial, which was that he eventually got money, therefore what he said at the time was true, and it didn't really do a good accounting job because he didn't have any records. He had lost them or destroyed them or… Was there evidence that he had received that money? There was evidence that he had received the money because the money came in. That was all checks that were brought in through the contractors. So, in other words, if I say my accounts receivable are 1.1 million, and then I bring in my checks and I say, guess what? Between the time I said that and the next report, it turns out I got. Here's my checks. I got this money and that money and this money and that money. So, overall, I actually exceeded what I thought would be my accounts receivable by a small excess. How could that be a false statement or how could that mislead or be knowingly false if, in fact, it was shown to be knowingly true? I think it depends on what he believed at the time that he submitted the form, and what the evidence showed at trial was that the claim that he made at a specific point in time when he submitted the Job Current Aging Report was not consistent with what the contractors that he identified in the loan as the people he was working for said that they owed him. Even if we gave him benefit for a couple of days of wobble, which we did, and even if we gave him the benefit of two-party checks, which we did, in order to make sure that we gave him every possible benefit of the doubt, there was still a discrepancy. It was a slight discrepancy at that time, and I think that's what explains the reasonable doubt that the jury found. That was on count 11, though, right? I think it was. Are you saying that each of the accounts receivable, are we looking at the total aggregate accounts receivable between point A and point B, or are you looking at each individual sub-account receivable? Like, well, if he said he was owed $45,000 by General Contractor A, then we have to show that $45,000 came in, and you have to match that up, or is it the aggregate? I have a million point one accounts receivable, and I got a million point three in that time, so where's the beef? Well, the answer is yes, that we did look at both of those. We looked at both the individual amounts that were claimed on the Job Current Aging Report submitted to the bank, which gave a specific amount for each job, and we had each witness from the contractor come in and say, that's when I said, how much did you owe him at that point based on these pay estimates, and they were able to establish that. Now, of course, the pay estimate is not a perfect correlation. Right, but you haven't really answered my question, which is if I can show you my accounts receivable over $1.1 million, and I actually receive all that money over a period of time, where's my false statement? If you got paid more than you really expected, if you lied at the time, let's go back and assume that he lied at the time. Okay, what's the proof that he lied at the time? Well, I was just kind of trying to make an assumption that he had lied at the time. No, you can't make an assumption, you see, you have to prove that. Right, but if he had, for the sake of argument, in my argument, assuming that he was not telling the truth at that time, what he believed he was going to get was less than $1 million, and then he got some extra that he didn't expect. The key in any false statement case is what you believed at the time that you made the statement, whether you believe that to be true or not, not whether you got lucky and got some extra money later on. Well, it's not a quick case of getting lucky. You've already said that there's timing and float issues. Everybody knows that in the construction business. But he's actually getting, and it's not a question of, well, I got $500,000 and I thought my accounts were $1.3, then that would look like a lie. But when you have such a close correlation between his accounts receivable and the amount he got, where's the basis for saying that he knowingly lied? That's my question. And our argument was that he had made that statement, and that he simply made these numbers up, that they were, he did not believe them to be correct. I mean, he got just totally lucky that he went, that he had $1 million, and then he got in $1.3 million. I think that was probably predictable at the end of summer when he's getting, he's been working all summer, and he's been getting paid by the contractors, and the money is coming in. Sure. But so if that's totally predictable, he's in August, he says, these are my accounts receivable. I know it's the end of summer. I know the money is going to start flowing in. My question is whether the government really sustained its burden on counts 10 through 15. Those are the ones that were blurred. I mean, those are the ones that I knew were closer and made that clear to the jury, and that's why I started the argument at the end and worked back. If we were to determine that those convictions did not meet the Jackson V. Virginia, would it make any difference to the outcome? It wouldn't because at the end, and again, that was what we, this was a complicated case in the sense that we had a lot of witnesses, and there were a lot of numbers, and there were a lot of documents. But at the end of the day, it was a fairly simplified case because in our position, he was clearly lying in the winter, in April, in February, in December, because there was nothing there. So at that point, he was convicted. Maybe my question wasn't clear. It matters count by count whether you win. It does. You don't just blur it together for the jury. That's true. That's why I don't know what you're even talking about. But I'm asking you, with respect to the sentence on the various counts, if you were to throw out those counts, would it matter? It would not.  That's within the statutory maximum on this, which is 10 years, I believe. So it's a, you know, relevant conduct would be admissible. The court made its other determinations about sentencing enhancements, and I don't think it makes a difference at the end of the day because, I mean, our argument, and of course the jury had to consider, don't get me wrong, the jury had to consider each count individually. I think that what we'd ask them to do is consider, you know, if he's willing to lie at that point, you know, how much are you willing to believe what he said before? And he, of course, testified at the trial. Okay. We have your argument in hand. Thank you. Thank you, Judge. So you have three minutes left for rebuttal. Thank you. Your Honor is correct when you're talking about counts 10 through 15 in that regard, in that the accounts receivable are estimates. They're not, you don't go out and make an itemized inventory or an invoice of exactly minute by minute what every employee has done, what every piece of material you've purchased. And so they're estimates. And so he was making a good faith effort to provide correct estimates in that regard. And so it wasn't that he was getting lucky and getting a windfall. It's that he truly believed that this was income that was going to be coming to him, and that was borne out, as Your Honor saw, in that August-September period in 2006 when he did receive $1.3 million. As to the 404B issue, you know, the government did rely on this and did rely on this as essentially exactly what 404B is meant to preclude. I think during closing argument, the government said after he was fired from First National Bank, he went down the street and found a bigger fool to dupe, so to speak. And that's at the excerpts of record at page 664. So the government was actually using this for the impermissible purpose. So it should have been excluded. And the government was testifying that he actually attempted in his argument  of what account practices were in the construction industry. But she was not an expert, and she wasn't proffered for that. And the government's own witnesses testified that there are a variety of different ways to book accounts receivable. So I don't think that she was relevant, Ms. Happel. I think that it was impermissible 404B evidence. And just something else to point out from the government's argument is Mr. Burns' business was a year-round business. It was not a seasonal business. Because he did electrical contracting work, he did outside work in the summer. And in the wintertime, he still continued to work and had indoor projects. So unlike other highway or outdoor construction projects that ramp up during the summer and then in the fall, Mr. Burns was typically busy year-round. And in August, during the count 10 through 15 time period, August, September of 2006, he did pay down the entire loan. He paid it all back, brought it down to zero for a period of several days, if not weeks, indicating that at that point in time, he had received all of the accounts receivable he said that he should receive, and he paid that money back to the bank. So up until that point, it appears that everything he did say did come true. And while there may be discrepancies in how to book accounts receivables, it appears that he did do the best that he could, and it turned out to be accurate. And then that's all that I have. So we'll submit. All right. Thank you. Thank you both for your argument this morning. The case just argued is submitted.
judges: Hawkins, McKeown, Bea